IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MARY BRAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CV 05-1282-KI |
| v. ) | |
| ) | |
| COMMISSIONER of Social Security, ) | OPINION AND ORDER |
| ) | |
| Defendant. ) | |
| ) | |

KING, District Judge:

## INTRODUCTION

Plaintiff Mary Bray appeals a denial of benefits for disability by the Commissioner of Social Security. Bray applied for disability insurance benefits on March 25, 2003. This claim was denied initially and upon reconsideration. Bray timely requested a hearing. On November 7, 2003, Bray protectively filed for Supplemental Security Income payments. That application was escalated to the hearing level and consolidated with her prior claim. A hearing was held before an Administrative Law Judge ("ALJ") on March 22, 2005, in Portland, Oregon. On April 8, 2005, the

1 - OPINION AND ORDER

ALJ issued his opinion, which denied benefits. This decision was made final when the Appeals Council declined Bray's request for review on June 22, 2005. The court has jurisdiction under 42 USC §§ 405(g) and 1383(c). The Commissioner's decision is affirmed.

## BACKGROUND

Ms. Bray was born on April 26, 1950. Tr. 54.[1] She completed high school and a one-year vocational program for medical assistants. Tr. 73. Her relevant employment experience includes work as a medical assistant and as an underwriter for health and life lines of insurance. Tr. 68. She last worked at a call center handling customer service calls in April 2004. Tr. 323. She was released from this job when she requested accommodations regarding her use of a nebulizer or, in the alternative, part-time hours. *Id*. She then attempted a training program with Portland Habilitation Center, to retrain as a custodian, but the exposure to chemical fumes and her inability to keep pace prevented her from continuing the program after three weeks. Tr. 311. Bray's coverage under Title II extends into 2008 and is not at issue in the case.

Bray is diagnosed with Chronic Obstructive Pulmonary Disease ("COPD"), asthma, hypertension, arthritis, and adjustment disorder with depression and anxiety. She alleges that these combined conditions have made it impossible to carry out sustained employment since November 9, 2001.

## DISABILITY ANALYSIS

I.   **The Sequential Evaluation Process**

---

[1]References to the Administrative Record of this case are designated "Tr." followed by the page number.

The Commissioner has outlined a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR §§ 404.1520, 416.920. Each step is potentially dispositive. Steps one and two - determining whether the claimant is engaged in substantial work activity, and assessing the severity of the claimant's health conditions - are not in dispute in the present case.

In step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 US at 140-41; 20 CFR § 404.1520(d). The criteria for these listed impairments, also called Listings, are enumerated in 20 CFR Part 404, Subpart P, Appendix 1 (Listing of Impairments). This stage of step three is not in dispute.

If the adjudication proceeds beyond the listings evaluation, the Commissioner must assess the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by her impairments. 20 CFR § 404.1545(a); Social Security Ruling (SSR) 96-8p. This issue is in dispute.

In step four, the claimant is not disabled if the Commissioner determines that the claimant retains the RFC to perform work she has done in the past. 20 CFR § 404.1520(e). This step is not in dispute.

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform other work that exists in the national economy. *Yuckert*, 482 US at 141-42; 20 CFR §§ 404.1520(e), (f). Here the burden shifts to the Commissioner to show that a significant number of

jobs exist in the national economy that the claimant can do. *Yuckert*, 482 US at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1566. This step is in dispute.

## II.     The ALJ's Decision

The ALJ found that Bray's COPD and her adjustment disorder were both severe impairments. Tr. 15. He found that Bray's impairments did not meet or medically exceed the listings. *Id.* He did not consider Bray to be wholly credible in her statements about her limitations. Tr. 19. He constructed the following RFC:

> The claimant has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently. She can stand and walk 6 hours out of an 8-hour day and sit 6 hours out of an 8-hour day. She can occasionally climb. She should avoid concentrated exposure to respiratory irritants. She is able to carry out, attend and concentrate on all but the most detailed and complex tasks.

*Id.* The ALJ also found that the claimant was an "individual closely approaching advanced age" for the purposes of applying the Medical-Vocational grids at step five. *Id.* He found a significant number of jobs existed in the national economy within the restrictions imposed by Bray's RFC. Tr. 20.

## III.    Standard of Review

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996) (citation omitted). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A).

4 - OPINION AND ORDER

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 USC § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F3d at 1039-40.

## DISCUSSION

Bray contends on appeal that the ALJ erred in constructing the RFC and vocational hypothesis he presented to the vocational expert ("VE") at the hearing. She also argues that the ALJ committed legal error at step five when he relied on VE testimony that Bray had transferable skills, and when he mechanically applied the grids in a borderline age situation.

**I.     Construction of the RFC.**

Bray argues on appeal that the ALJ improperly discredited her testimony regarding her impairments. She also contends that the ALJ gave the opinion of Dr. Seyer insufficient weight without justification. Finally, she argues that the ALJ's failure to include a restriction related to her mental disorder in the RFC was in error.

**A.     Bray's Credibility.**

Bray testified that she was unable to work full-time due to her COPD. Tr. 16. She stated at the hearing that she was able to carry a bag of groceries weighing about 5 pounds, but that she could not lift 20 pounds and would not want to carry more than 10 pounds "very far." Tr. 314-15. She also

stated that she could not walk more than half a block without needing to use her nebulizer or inhaler. Tr. 320. She said that, since losing her job as a medical assistant, she had been seeking work due to financial troubles. Tr. 324. On appeal, Bray argues that the ALJ improperly rejected her statements about her limitations.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the ALJ must assess whether the claimant has met her burden to: (a) "produce objective medical evidence of an impairment or impairments"; and (b) "show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom." *Smolen v. Chater*, 80 F3d 1273, 1282 (9th Cir 1996) (citations omitted, emphasis in the original). The claimant is only required to produce objective medical evidence of the impairment, not of the symptom itself, the severity of the symptom or the causal relationship between the impairment and the symptom. *Id*. The claimant is also not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused *some* degree of the symptom. *Id* (emphasis added).

In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. To determine whether subjective testimony is credible, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Id* at 1284 (citations omitted).

The following factors must also be considered: the circumstances under which the claimant testified, any contradictions or corroborations, the claimant's prior work record, the nature of any symptoms and medical treatment, her daily activities, and any other factors concerning the claimant's functional limitations and restrictions. 20 CFR § 404.1529; SSR 96-7p, 1996 WL 374186, *3. In weighing evidence of pain, the ALJ is also required to consider the "nature, location, onset, duration, frequency, radiation, and intensity of any pain," "precipitating and aggravating factors such as movement, activity, environmental conditions," "type, dosage effectiveness, and adverse side-effects of any pain medication," "treatment, other than medication, for relief of pain," "functional restrictions" and "the claimant's daily activities." SSR 88-13, 1988 WL 236011, *3-4.

"[O]nce a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan*, 947 F2d 341, 345 (9th Cir 1991) (*en banc*) (citation omitted). "While subjective pain testimony cannot be rejected on the sole ground that it is not corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and *its disabling effects*." *Rollins v. Massanari*, 261 F3d 853, 857 (9th Cir 2001), citing 20 CFR § 404.1529(c)(2) (emphasis added).

If the ALJ finds the claimant's symptom testimony is not credible, the ALJ "must specifically make findings which support this conclusion" and the findings "must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit" it. *Bunnell*, 947 F2d at 345 (internal quotations and citations omitted). If there is no evidence of malingering, the ALJ may reject symptom evidence only if he

7 - OPINION AND ORDER

gives clear and convincing reasons, including which testimony is not credible and what facts in the record lead to that conclusion. *Smolen*, 80 F3d at 1281.

In the present case, the ALJ found Bray to be "not entirely credible" in her testimony. Tr. 19. He cited the treatment record, Bray's prior inconsistent statements to her physician, and her activities of daily living as contradicting her testimony at the hearing. Tr. 16. Specifically, he took issue with Bray's claims of debilitating shortness of breath. He cited her smoking habit and statements to her treating physician, Dr. Seyer, that only heavy exertion resulted in dyspnea or asthmatic symptoms. *Id*. He pointed out that during the alleged disability period Bray made several attempts to work, and that the work activities described contradicted her alleged physical limitations. He also stated that Bray's statements to her doctor were not consistent with her claim that she could walk only one half of a block, and could not lift twenty pounds. *Id*. Finally, he pointed out that despite running out of antidepressant medication, Bray did not seek additional treatment for her depression or anxiety. *Id*. Here as in other areas of the opinion, the ALJ highlighted Bray's continued efforts to obtain a job. *Id*.

Bray argues that the ALJ erred in reaching these conclusions, and that he failed to point out a single inconsistency between the allegations made at the hearing and on the disability report and the record as a whole. This is not true. The Commissioner properly points out the evidence and reasoning that the ALJ used in assessing Bray's credibility. Much of that reasoning is summarized above. Bray does not take issue with the inconsistencies cited between the intake statements to medical professionals and her testimony at the hearing. On February 19, 2004, Bray reported to Dr. Seyer that her COPD is "going well." On May 13, 2004, Dr. Seyer recorded a comment that Bray was working at her telemarketing job but could "only" work for 8 hours a day. These statements are

8 - OPINION AND ORDER

inconsistent with her claims at the hearing. Analysis of the record in this fashion is a cogent, specific, and appropriate method of assessing the credibility of the claimant.

The ALJ also found the severity of Bray's allegations to be inconsistent with her medical record as a whole. This assessment appears reasonable. Bray's medical history, and specifically the images taken of her heart and lungs, show no more than moderate obstructions of airflow. Tr. 274, 295. In an airflow obstruction test on January 21, 2004, after a hospitalization for exacerbated COPD, Dr. Juarez found only moderate airflow obstruction and moderate reduction in DLCO. Tr. 265. Bray, on the other hand, claimed at the hearing that she could not walk more than half a block without using her inhaler.[2] In situations where the claimant alleges symptoms at a higher level than the objective medical record provides, the Commissioner may disbelieve that testimony. *Nyman v. Heckler,* 779F.2d 528, 531 (9th Cir. 1985) citation omitted ("Further, a claimant's self-serving statements may be disregarded to the extent they are unsupported by objective findings.").

In response to the ALJ's use of Bray's jobs and responsibilities in the alleged disability period, Bray points out that the ALJ did not find her companion job to represent substantial gainful activity. However, the ALJ was not using the evidence of her attempts at work as proof that she could work. Rather, he was identifying patterns of behavior that were inconsistent with her allegations. The fact that the job did not pay enough to be considered substantial gainful activity does not, by itself, invalidate the ALJ's use of the job, and its attendant functions and obligations, in assessing the credibility of Bray's allegations. Bray contends in reply that none of the functions of the job involved

---

[2] In the face of the medical record and other testimony in this case, and even before considering the analysis of the ALJ, this court finds it difficult to credit Bray's statement. Were she to be in such dire straits regarding her COPD she would likely have a much more intensive treatment record, to say nothing of the opinion of Dr. Seyer in May of 2004, which would have been substantially more restrictive than prescribing a maximum of half-time work.

9 - OPINION AND ORDER

lifting, and that the work was only part time. However, the job descriptions Bray provided regarding her various jobs involve a level of exertion greater than that described by Plaintiff as her functioning limit. The ALJ's analysis appears reasonable and is supported by the record.

Bray also contends that the ALJ erroneously cites her smoking habit to impugn her credibility. In her reply brief, she requests that the court adopt the reasoning of *Shramek v. Apfel*, 226 F. 3rd 809 (7th Cir. 2000). In *Shramek,* the court found that the ALJ erred because he improperly interpreted the plaintiff's failure to quit smoking as failure to comply with doctor's orders. 226 F.3rd 809 at 812, *see also* 20 C.F.R. § 404.1530(a). The court took issue with the ALJ construing the noncompliance statute as weighing on credibility. *Id.* It stated in dicta that using a claimant's addiction to nicotine to impugn her credibility was "extremely tenuous." *Id.* Bray argues that this decision is applicable to her own claim for disability.

The present case is distinguishable. The claimant in *Shramek* did not have COPD, or even a lung condition. Rather, the admonishment to cease smoking was related to the potential exacerbation of her deep venous thrombophlebitis.[3] *Id.* In Bray's case, the ALJ did not point to her continued smoking as "noncompliance" of any sort. Rather, he stated that Bray's alleged shortness of breath and sensitivity to chemical fumes were contradicted by her continued use of cigarettes. The ALJ was pointing out a *behavior* that exposed Bray to a highly concentrated collection of chemicals

---

[3] *Shramek* cites and relies upon *Rousey v. Heckler,* 771 F.2d 1065 (7th Cir. 1985) in which the claimant did in fact have COPD. In *Rousey*, the court held first that it was inappropriate for the ALJ to deny the claim based on 20 CFR § 404.1530(a) solely because claimant continued smoking. *Rousey*, 771 F. 2d at 1069. The court then opined that it was illogical to conclude that claimant's allegations of chest pain were not credible due to her continued smoking. *Id.* at 1070. In both holdings, the court relied on the fact that no causal connection could be drawn between claimant's smoking and the symptoms she alleged. The dicta in *Shramek* concerning credibility carries no such rationale and appears geared at simply eliminating smoking as a factor in assessing credibility.

10 - OPINION AND ORDER

on a regular basis. While this reasoning - to the extent that it deals with Bray's shortness of breath - would be called into question by the holding in *Rousey,* this court declines to accept the suggestion in *Shramek* that the addictive nature of cigarettes overwhelms any use of a claimant's tobacco habit in assessing credibility. In the present instance, such a ruling would invalidate an observation that any reasonable person in the ALJ's position would make. This court finds that the observation was a legitimate method of assessing Bray's credibility.

Finally, Bray points out that only if the claimant's activities of daily living are inconsistent with her alleged limitations do they have any relevance to credibility. *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998). She contends that this invalidates the ALJ's use of her daily activities as evidence against her credibility. Even if we accept this argument, it amounts to harmless error. Bray's objection can not pertain to the activities described above, as they are well above the functional limitations Bray alleges. At best it would invalidate the ALJ's use of her cooking, cleaning, and walking the dog. These are largely immaterial.

The ALJ's decision properly provided cogent and specific reasons for doubting Bray's allegations, specified what allegations he was discrediting, and supported his reasoning with evidence in the record.

### B.    The Opinion of Dr. Seyer.

Bray argues that the ALJ's treatment of Dr. Seyer's statements and his prescription of a half-time work limitation was erroneous. Dr. Seyer's medical notes from May 13, 2004 read as follows:

> Patient was seen in the E.R. again with exacerbation of COPD. She's been working but she can only go for about 8 hours a day...She likes her job and would like to keep it but right now she's asking for half day work instead of full day. Continues to *feel* dyspneic although she's pretty much at baseline with how she was before.

Tr. 252, emphasis added. At the hearing Bray presented a prescription slip filled out by Dr. Seyer on the same day, which stated "May work 5 days a week but limited to 4 hours a day. Rx: COPD. Duration: 99 months." Tr. 302. Bray contends that this work limitation applies to her from her alleged onset date forward, and that the ALJ erred in rejecting this statement.

The Commissioner has the discretion to reject the testimony of a treating physician. Where the treating doctor's opinion is contradicted by another doctor, it may not be rejected without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995) (citation omitted). If the opinion is not contradicted, then it may only be discredited for "clear and convincing reasons." *Thomas v. Barnhart*, 278 F3d 947, 956-57 (9th Cir 2002) (citation omitted). In the present situation, the opinion of the DDS reviewing physicians contradicted the assessment of Dr. Seyer. Accordingly, the ALJ must provide "specific and legitimate reasons" for giving little weight to the opinion of Dr. Seyer.

The ALJ stated in his opinion that there was no medical justification for the work limitation in the record. He pointed to the eight-month gap between the requested work release and the next time Bray needed to see her physician for another exacerbation of her COPD (at which time she also requested a written release for missed time at work), and suggested that the gap between exacerbations did not support an ongoing work limitation. He also noted that nothing in the medical record supported the doctor's prescription. At the visit on May 2004, Dr. Seyer's intake contradicts itself, stating first that Bray "can only go 8 hours a day" and then logging Bray's request that she be limited to half-time. At that visit, Dr. Seyer heard "some diffuse bilateral expiratory wheezing." Tr. 252. As quoted above, he noted that Bray *felt* dyspneic, but also noted that she was at baseline.

12 - OPINION AND ORDER

During the next office visit, on January 21, 2005, Dr. Seyer again noted "some bilateral wheezing," and suggested that Bray might require a "short course of steroid if no improvement by Monday." Tr. 299. Neither of these office visits amount to much in the way of medical support for a half time work limitation. The ALJ also pointed to an earlier visit to Dr. Juarez on January 20, 2004, where Bray stated that she only experiences dyspnea when "performing heavy exertion." Tr. 260. This statement was made a mere three months before the flare-up in May 2004, when Bray requested the work limitation.

Bray urges us to consider *Embrey v. Bowen,* which criticizes an ALJ for failing to "give proper weight to the subjective elements of the doctors' diagnoses." Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). However, it was the claimant's subjective impression, not the doctor's, that led to the prescription of half-time work. The ALJ, having already determined that the plaintiff was not entirely credible, naturally would call into question a prescription requested by Bray and "supported" by subjective intake comments from the patient.

In any event, there is substantial evidence in the record - without reference to the opinion of the DDS reviewing physician - to support the ALJ's reasons for discrediting the prescription slip. Those reasons are specific and legitimate. When the reviewing physician's opinion of Bray's condition is added to the mix, this court has no alternative but to uphold the opinion of the ALJ.

### C. The absence of mental factors in the RFC.

Bray alleges that the ALJ erred in not including some sort of work limitation relating to her adjustment disorder. Upon finding the disorder to be a "severe" impairment, Bray contends, the ALJ was duty-bound to find that Bray suffered work limitations. She cites 20 C.F.R. § 404.1521 as controlling; it states in part that an impairment "is not severe if it does not significantly limit your

13 - OPINION AND ORDER

physical or mental ability to do basic work activities."  In other words, because Bray's disorder was severe, the ALJ ought to have found attendant significant limitations when constructing Bray's RFC.

While this conundrum is attractive, it amounts to naught in the end.  The definition of "not severe" can not operate as a syllogistic definition of "severe."  Dr. Krishnan's assessment of Bray states that she would not suffer any real work interruption as a result of her mental condition.  Tr. 225-226.  The ALJ relied on this diagnosis while creating the RFC, and included a limitation that she would be restricted from doing "only the most complex and detailed tasks" per the language in the assessment form.  Tr. 19.  He also pointed out that, despite an interruption of her antidepressant medication, Bray did not seek follow-up care for her mental condition.  Tr. 16.  While one could argue that this analysis is incongruous with the finding that the disability is severe, this court is faced with one of two conclusions; either the ALJ committed harmless error by stating that the adjustment disorder was severe when it was *not*, or there are in fact *some* severe mental impairments that have limited or no impact on a claimant's ability to perform work, and Bray's syllogism contains a fallacy. This court prefers the second conclusion, and declines to credit Bray's interpretation of the statute.

## II.     The ALJ's Analysis at Step Five.

Bray contends that the ALJ erred in crediting her with transferable skills and in mechanically applying the grids in a borderline age situation.

### A.     Transferable Skills Analysis.

Bray contends first that the ALJ's failure to list Bray's relevant transferable skills is improper under SSR 82-41.  She also argues that, even if there is evidence of transferable skills, the jobs which

the ALJ found at step five would not afford Bray the opportunity to apply those skills, because they do not share raw materials, products, processes, or services with her previous work experience.[4]

In step five, the Commissioner bears the burden to show that the claimant can do other work which exists in the national economy. *Yuckert*, 482 US at 141-42; *Tackett*, 180 F3d at 1099. She can satisfy this burden by referring to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2, or by eliciting the testimony of a vocational expert with a hypothetical question that accurately reflects all the limitations of the claimant. *Tackett,* 180 F3d at 1099, 1101.

Bray contends that the ALJ was required to specifically find that Bray had transferable skills, and list what they were, in his opinion. In response, the Commissioner argues that the guidelines issued in SSR 82-41 apply only to situations where the ALJ is relying solely on the grids to determine the outcome of the claim. In support, the Commissioner cites *Wilson v. Commissioner of Social Security*, 378 F.3d 541 (6th Cir. 2004). In *Wilson*, the court rejected a very similar argument regarding the ALJ's failure to specifically enumerate the transferable skills of the claimant. *Id.* at 549. The Commissioner argued that SSR 82-41 specifically addressed the procedure involved when using the medical-vocational grid as the sole basis for the determination of disability. After reviewing the ruling in question, the court gave deference to the agency's interpretation of its own regulation. *Id.* This court agrees. The full title of the SSR in question is "Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations Effective February 26, 1979." The "Pertinent History" section of SSR 82-41 relates the history of the introduction of the

---

[4] Bray also argues that the ALJ used an inappropriate vocational hypothesis when examining the VE. Because this argument relies upon the earlier arguments that the ALJ inappropriately discredited Bray's testimony and the opinion of Dr. Seyer, it becomes a moot point. It is this court's ruling that the evidentiary analysis of the ALJ was free of error, and therefore the vocational hypothetical was complete.

medical-vocational guidelines in February of 1979, and then states "There have been some misinterpretations and misapplications of the regulations relating to determining the skill levels of jobs and whether or not skills are transferable." SSR 82-41, 1982 WL 21239 (S.S.A.) *1. This appears to relate directly back to the history of the medical-vocational guidelines described above. It is also rational that, in the absence of supplementary testimony from a vocational expert, the ALJ would be obligated to specifically include a finding related to transferable skills. However, where a VE is utilized, the source of the evidence regarding transferable skills is apparent and reviewable by the court. The ruling specifically states that the ALJ can and should seek the assistance of VE in making determinations regarding transferable skills. *Id.* at *4. This is precisely what happened at Bray's hearing, and the ALJ's reliance upon that testimony is a legitimate way of meeting his burden of proof at step five. As regards the impact of the omission of a specific finding, this court finds no difficulty reviewing the rationales behind the ALJ's decision at this step.

Bray argues further that the VE testimony is insufficiently detailed regarding the skills acquired during past relevant work. The VE responded to the question of transferrable skills from the ALJ by stating:

> There are skills transferrable in relationship to office clerical responsibility. In our underwriting job[,] even as a medical assistant, she was exposed to computers, filing, typing, customer service, possibly some data entry, those kind of skills.

Tr. 331. She then identified three jobs - general clerk, file clerk and sales clerk - that were available in large numbers nationwide and in the state of Oregon, and that would offer an opportunity for Bray to use the skills she had acquired in her past relevant work. Tr. 332.

16 - OPINION AND ORDER

Bray contends that this testimony should bear little weight. She argues that calling exposure to computers, filing, typing, or customer service "skills" is contrary to common sense. She also takes issue with "possibly data entry" as vague and unilluminating. After such close and detailed analysis of SSR 82-41, it is surprising that Plaintiff missed the following:

> On the other hand, a semiskilled general office clerk (administrative clerk), doing light work, ordinarily is equally proficient in, and spends considerable time doing, typing, filing, tabulating and posting data in record books...etc. *These clerical skills* may be readily transferrable to such semiskilled sedentary occupations as typist, clerk-typist and insurance auditing control clerk.

SSR 82-41 at *3, emphasis added. It appears that the SSA has no problems considering the above-listed work behaviors as skills. In addition, Bray testified that she was "familiar with the use of a computer." Tr. 325. This court assumes that "familiar" is higher up the skill tree than "exposed to." Either way, it was correct for the VE to assume that Bray had some degree of computer skill. Finally, Bray testified at the hearing that prior to her job at Light Bridge she was engaged in a job hunt for work in "customer service, office work, medical office receptionist, scheduler, phones." Tr. 324. It seems disingenuous at best to now claim that she lacks the skills for work that she actively sought as recently as 2004.

Bray next argues that, even if we credit the VE testimony regarding transferrable skills, the jobs that the VE identified are not ones at which she could succeed. She points to the Dictionary of Occupational Titles listings for those jobs and argues that the different industries involved in each make her successful transition unlikely. She also suggests that her adjustment disorder directly bears upon the evaluation of the transferability of any skills she may possess.

"Transferability of skills is most probable and meaningful among jobs in which- (I) the same or a lesser degree of skill is required; (ii) The same or similar tools and machines are used; and (iii) the same or similar raw materials, products, processes, or services are involved." 20 C.F.R. § 404.1568(d)(2). Complete similarity of all three factors is not necessary for transferability. 20 C.F.R. § 404.1568(d)(3).

In Bray's case, the ALJ clearly felt that the "processes and services" of her prior jobs yielded skills that would assist her in moving into clerical and customer service jobs that had comparable "processes and services." Even if we credit the assertion that Bray does not possess customer service skills, her transferable skills in the clerical area qualify her for both the office clerk and the file clerk positions. The fact that these jobs represent a "shift in industry" does not invalidate the VE's testimony. The tasks for office workers of this type do not vary dramatically based on which industry they serve. As for Bray's mental capacity to adjust, Dr. Krishnan specifically stated that Bray could operate normally in a competitive environment.

In sum, the Commissioner has met the burden of proof required to establish that there are other jobs in the national economy which Bray could perform.

B. **The mechanical application of the grid.**

Bray last contends that the ALJ "mechanically" applied the medical-vocational grid in his decision. She argues that, had the ALJ exercised his discretion in accordance with the guidelines for borderline age situations, she would have been found disabled under rule 202.6. At the time of the hearing, Bray's fifty-fifth birthday was roughly a month away. When the ALJ issued his opinion on April 8, 2005, Bray was 18 days away from being 55. This represents a transition point in the analytical process, into a new category known as "advanced age."

The application of the grid is not intended to be a mechanical process. In situations in which the difference of a few days or months would result in a different outcome in a disability determination, the Commissioner is required to "consider whether to use the older age category after evaluating all of the other factors in the case." 20 C.F.R. § 404.1563(b). There are special provisions related to transferability of skills based on the claimant's age. To find that an individual who is age 55 or over and is limited to *sedentary* work exertion has skills transferable to sedentary occupations, there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry. SSR 82-41 at *5. The same is true for individuals who are *age 60* and older and are limited to light work exertion. *Id.*

Reference to the grid reveals that Bray is assuming that she has no transferable skills. If this were the case, and if the ALJ had determined that all circumstances weighed in favor of applying the higher age category, then rule 202.6 would direct a finding that Bray suffered a disability. However, if the finding that Bray has transferable skills is legitimate, then the application of the guidelines, even at "advanced age," directs a finding that Bray is not disabled. The RFC limits Bray to light work, meaning that the special provisions for transferability based on age do not apply. Rule 202.07 dictates that, where an individual of advanced age has transferable skills from previous work experience, a finding of not disabled is proper. The question then becomes whether additional factors - specifically, Bray's adjustment disorder - would tip the balance. As discussed above, and in spite of its name, Dr. Krishnan has opined that Bray's adjustment disorder would not impede her ability to function in a workplace setting. The ALJ properly relied on this opinion when constructing the RFC, and in the absence of competing evidence in the medical record, this court also accepts the opinion as it bears on the application of the grid.

19 - OPINION AND ORDER

On the basis of the medical evidence, the testimony of Dr. Krishnan, and the testimony of the VE at Bray's hearing, this court concludes that the ALJ's failure to apply the older age category was harmless error.

## CONCLUSION

Based on the foregoing, the ALJ's decision that Bray does not suffer from a disability and is not entitled to benefits under the Social Security Act is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision is AFFIRMED and the case is DISMISSED.

DATED this __13th__ day of October, 2006.

    /s/ Garr M. King
Garr M. King
United States District Judge

20 - OPINION AND ORDER